Allman & Nielsen, P.C.
Steven A. Nielsen CSB 133864
  Steve@NielsenPatents.com
100 Larkspur Landing Circle
Suite 212
Larkspur, CA 94939-1743
(415) 461-2700
(415) 461-2726 (fax)

Attorneys for Defendants
SUPER MARKET MERCHANDISING AND
SUPPLY, INC. AND KEVIN KNASEL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CLAMP-SWING PRICING COMPANY, | Case No.  3:13-cv-04515 |
| Plaintiff, | **OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| v. | |
| SUPER MARKET MERCHANDISING AND SUPPLY, INC. AND KEVIN KNASEL | |
| Defendants. | Judge: Hon. William H. Orrick |

- 1 -

1

## **TABLE OF CONTENTS**

2

3

4   TABLE OF AUTHORITIES ................................................................................................ 3

5   INTRODUCTION ............................................................................................................... 4

6   BACKGROUND ................................................................................................................. 5

7   ARGUMENT ..................................................................................................................... 11

8   I.    A Temporary Restraining Order and Preliminary Injunction are Extraordinary Remedies

9   that Should Not Be Granted to a Dilatory Plaintiff. .............................................................. 11

10  II.    Defendants Are Not Subject to Personal Jurisdiction in this District. ........................... 12

11  III.    Plaintiff's Application Should Be Denied As Plaintiff Is Unlikely to Prevail on the

12  Merits of its Trade Dress Claim. ........................................................................................ 14

13      A.    Plaintiff's Claimed "Thick Cylindrical Sides" Trade Dress Is Functional. ................ 15

14      B.    Plaintiff Is Unlikely to Prove Secondary Meaning or Likelihood of Confusion. ........ 17

15  IV.    Plaintiff's Own Actions Belie Any Claim of Irreparable Harm and Tip the Balance of

16  Hardships in SMMS's Favor. ............................................................................................. 20

17  CONCLUSION ................................................................................................................. 23

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A
TEMPORARY RESTRAINING ORDER**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Art Attacks Ink, LLC v. MGA Ent. Inc*, 581 F.3d 1138, 1145 (9th Cir. 2009) ........................ 17, 18

*Aurora World, Inc. v. Ty Inc.*, 719 F.Supp.2d 1115, 1154-55 (C.D. Cal. 2009)........................... 18

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066 (9th Cir. 2011).................................... 13

*Eliminator Custom Boats v. American Marine Holdings, LLC*, 2006 WL 4941830 (C.D. Cal. Aug. 31, 2006) ........................................................................................................................................ 14

*Focht v. Sol Melia S.A.*, 2012 WL 162564 (N.D. Cal. Jan. 19, 2012) ........................................... 13

*Fuhu, Inc. v. Toys "R" Us, Inc.*, 2012 WL 5197556 *6 (S.D. Cal. Oct. 19, 2012) ...................... 17

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 411 (1984) .......................... 13

*Int'l Jensen, Inc. v. Metrosound USA, Inc.*, 4 F.3d 819, 824 (9th Cir. 1993). .............................. 18

*Lumascape USA, Inc. v. Vertex Lighting, Inc.*,  (N.D. Cal. March 29, 2006)................................ 13

*Miller v. California Pac. Med. Ctr.*, 991 F.2d 536 (9th Cir.1993) ................................................ 12

*NationalEFT, Inc. v. Checkgateway, L.L.C.*, 2013 WL 593759, *5 (S.D. Cal. Feb. 15, 2013)..... 13

*Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F.Supp.2d 1086, 1097 (N.D. Cal. 2012).......... 11

*Secalt S.A. v. Wuxi Shenxi Constr. Machinery Co., Ltd.*, 668 F.3d 677, 683 (9th Cir. 2012)........ 15

*Shorter v. Peaches Uniforms, Inc.*, 2010 WL 5135366 (E.D. Cal. Dec. 8, 2010) ......................... 14

*Studio Red Inc. v. Rockwell Architecture Planning and Design, P.C.*, (N.D. Cal. May 18, 2007) 11

*Stulbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) ................................................................................................................................................ 11

*Talking Rain Beverage Co. v. S. Beach Beverage Co.*, 249 F.3d 601, 604 (9th Cir. 2003) .......... 16

*Walker v. Varela*, 2013 WL 816177 * 2 (C.D. Cal. Mar. 1, 2013)................................................ 12

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) ...................................... 17

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)................................... 11

*Zepeda v. U.S. Immigration and Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1985)........... 12

*Zodiac Pool Sys. v. Aquastar Pool Prods., Inc.*, 2013 (S.D. Cal. Feb. 22, 2013)............. 12, 15, 21

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

1

## INTRODUCTION

2

3

This lawsuit[1] is nothing more than the latest installment in Plaintiff's effort to improperly

4

exclude SMMS from the relevant market for plastic sign holders.  The parties have been engaged

5

in litigation over these products since Plaintiff sued SMMS in 2012.  Tellingly, Plaintiff never

6

identified or claimed any trade dress rights in its plastic sign holders until SMMS redesigned its

7

sign holder to fall far afield of Plaintiff's patent rights.  Indeed, Plaintiff never identified its

8

alleged trade dress rights before SMMS began selling its redesigned sign holder, despite the fact

9

that SMMS provided Plaintiff with drawings showing the new design.  For more than five

10

months, Plaintiff admitted that the new design did not infringe any patents and Plaintiff never

11

mentioned any trade dress issues with the redesigned product.  Further, Plaintiff remained silent

12

despite knowing of sales by SMMS since 2008 of an earlier design of its plastic sign holders that

13

had the same "thick cylindrical sides."  Yet Plaintiff now seeks a temporary restraining order on a

14

15

rush basis against sign holders with "thick cylindrical sides." Plaintiff's attempt to craft trade

16

dress rights to extend where its patent rights clearly do not must fail.

17

Further, Plaintiff has taken no action against a larger market participant, FFR-DSI, Inc.

18

("FFR"), who has been selling sign holders with thick cylindrical sides *identical* to the trade dress

19

20

claimed by Plaintiff *for approximately six years*.  It follows that the alleged trade dress, a sign

21

holder with thick cylindrical sides, is generic in the marketplace and does not indicate or cause

22

any confusion regarding source, sponsorship or affiliation with Plaintiff.  As such, Plaintiff's

23

24

25

26

27

28

---

[1] There is no personal jurisdiction over the defendants named in this case.  SMMS has never sold the accused sign holder in the State of California or in this judicial district, nor any of the predecessor designs, and so there is no specific jurisdiction.  SMMS has also had inconsequential contact with the State of California and this judicial district.  As explained in Section II, below, such contact falls well short of the requirements for general jurisdiction.  Because of this fundamental jurisdictional flaw, Plaintiff's lawsuit must be dismissed.  Defendants will be filing a timely motion to dismiss for lack of personal jurisdiction shortly.  For now, and as discussed during the Hearing with the Court on October 8, 2013, the Defendants reserve the right to challenge personal jurisdiction and are submitting this opposition per the schedule that the Court has ordered.

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

asserted trade dress claim fails on the merits.  And given Plaintiff's long tolerance of other sign frames with thick cylindrical sides, Plaintiff's claim of irreparable harm lacks merit.

Plaintiff's ill-founded application for a temporary restraining order must be denied, for any of the following independent reasons:  (1) this Court lacks personal jurisdiction over the Defendants, as none of the alleged acts underlying Plaintiff's claims, namely SMMS's sales of the accused sign, occurred in the State of California and there is no basis for general jurisdiction; (2) Plaintiff is not likely to succeed on the merits of its trade dress claim; and (3) Plaintiff will suffer no irreparable harm by SMMS's continued sales of the accused product.

SMMS respectfully submits that Plaintiff's application for a temporary restraining order should be denied.

## BACKGROUND

On May 14, 2012, Plaintiff filed a patent infringement lawsuit against SMMS alleging that SMMS's first generation sign holder infringed claims of U.S. Patent Nos. 6,530,166 ("the '166 patent") (Ex. A) and several design patents purportedly owned by Plaintiff.  In an effort to amicably resolve the dispute between the parties without further costly litigation (even though SMMS maintains none of its products infringe any of CSP's patents), SMMS voluntarily redesigned its first generation product to a second generation product that was even farther afield of CSP's patent rights.  Ex. B, Wang Decl. ¶ 5.  SMMS's "first generation" and "second generation" sign holders have near identical frames:

- 5 -

1
2
3

First Generation                    Second Generation

          

4
5
6
7
8
9
10

As shown above, the second generation product has the same basic cylindrical frame, as relevant

11
12

to this trade dress dispute, as the first generation product.  But Plaintiff did not raise any concern

13

at that time over its purported trade dress.

14

After SMMS redesigned its product, Plaintiff filed an Amended Complaint in the original

15

lawsuit adding the second generation product and claims of infringement of U.S. Patent

16

No. 8,220,189. [2]  Notably, despite the appearance and cylindrical sides of the frame of SMMS's

17

first and second generation products, and the fact that CSP knew of SMMS's first generation

18

product since 2008, Plaintiff still did not include any trade dress allegations in its original

19
20

lawsuit—though Plaintiff does premise its actual confusion arguments in the present motion on a

21

declaration from an individual who allegedly believed SMMS's first generation products were

22

Clamp-Swing's products.  Dkt. 7 at 22.

23

After Plaintiff amended its complaint in the patent infringement suit, SMMS, again in an

24

effort to amicably resolve the dispute between the parties without further costly litigation,

25

redesigned its product to further distinguish the parties' products.  Ex. B, Wang Decl. ¶ 6.  The

26

27
28

[2] Ex. D.  The '189 patent is a continuation of an application filed as divisional of the application
that issued as the '166 patent.  As such, the specifications and figures of the '189 and '166 patent
are the same.

- 6 -

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A
TEMPORARY RESTRAINING ORDER**

result was SMMS's "third generation" product; the only one accused of infringement in this trade

dress action.  Dkt. 1 at ¶ 47 ("The product accused of infringement in this case (the "Third

Generation Product") is the successor to the Second Generation Product.").  SMMS disclosed the

design of its third generation product to Plaintiff on April 1, 2013 by producing engineering

drawings depicting the third generation product.  Ex. C.  At no point between April 2013 and the

filing of this lawsuit did Plaintiff object to this design as infringing any purported trade dress.

Indeed, Plaintiff's counsel never discussed the issue of trade dress with Defendant's counsel until

after Plaintiff filed this lawsuit.

 The '166 and '189 patents are among several patents owned by Plaintiff that disclose, and

claim, Plaintiff's purported trade dress.  The first was filed in 1984—the same year Plaintiff

claims it first used the asserted trade dress.  Dkt. 1 at 10.  That application issued in 1988 as U.S.

Patent No. 4,777,750, and includes the following figures among others:





**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A
TEMPORARY RESTRAINING ORDER**

1   There can be no dispute that these figures depict a frame with thick cylindrical sides identical to

2   that Plaintiff now claims as trade dress (Dkt. 7 at 2).[3]

3       The '166 and '189 patents also contain similar figures depicting a plastic sign holder

4   including a frame with thick cylindrical sides:



16  The cylindrical frame halves (**15** and **16**) shown in Figure 3 are the same as those shown in

17  Figure 1.  The specification of these patents further explains the function served by the thick

18  cylindrical sides of the frame—frictionally engaging the C-shaped receiving portion of the base or

19  stem of the sign holder to securely hold the frame in place:

> base **11** includes a C-shaped receiving element **19** which is sized to *frictionally*
> *retain cylindrical portion* **18** of stem **9** as shown *or frame halves* **15** *and* **16** . . .
> Frame halves **15** and **16** when snap fit together are separated from one another by
> shoulders (not shown) creating gap **21**.  Ridge **22** is configured to pass within and
> be captured by gap **21** . . . as *C-shaped member* **4** *frictionally captures the outer*
> *surface of frame halves* **15** *and* **16**.

'166 Patent at Col. 3, ll. 7-10, 24-27 (italics added for emphasis).

---

[3] The same sign frame is also depicted in U.S. Patent Nos. 4,881,707; 5,697,589 and 5,918,842, which are owned by Plaintiff.

This "C-shaped member" that frictionally captures the cylindrical frame is specifically claimed in both the '166 and '189 patents:

| '166 Patent Claim 1: | '189 Patent Claim 1: |
|---|---|
| **1.** A sign holder device comprised of individual parts which, upon assembly, provides for support and display of signage in a plurality of orientations, said sign holder device comprising a stem having a first end and a second end, said first end configured to be releasably retained by a base and said second end configured to retain a sign frame, said base configured to receive and support said first end of said stem and a sign frame configured to be releasably retained by said second end of said stem, said sign frame having a left side and a right side and a gap between said left side and said right side, said gap being provided with tabs for positioning said stem on said frame to retain said stem on said frame in a predetermined location and, wherein said second end of said stem is provided with a C-shaped extremity sized to frictionally capture said sign frame such that said sign frame is releasable from said stem by providing lateral force to said frame. | **1.** A sign holder device comprised of individual parts which, upon assembly, provides for support and display of signage in a plurality of orientations, said sign holder device comprising a sign frame, a stem having a first end and a second end, said first end configured to be releasably retained by a base and said second end configured to retain said sign frame, wherein said second end of said stem is provided with a C-shaped extremity sized to frictionally capture said sign frame such that said sign frame is releasable from said stem and further comprising an adapter for connecting said stem to said adaptor and said adaptor to said base and wherein at least one indent and protrusion combination is provided between said adapter and said base. |

U.S. Pat. No., 6,530,166 (issued Mar. 11, 2003); U.S. Pat. No. 8,220,189 (issued Jul. 17, 2012)

In fact, Plaintiff emphasized this "C-shaped" requirement of the claims to overcome rejections by the examiner during prosecution of the '189 patent:

> As the Examiner is well aware, the present invention includes a base having a C-shaped extremity sized to frictionally capture either a stem which is, in turn, attached to a sign frame or the frame directly when the stem is eliminated. If one turns to the present specification and, specifically, page 5, lines 17-19, the following can be found:
>
> > Base 11 includes C-shaped receiving element 19 which is sized to frictionally retain cylindrical portion 18 of stem 9 as shown or frame halves 15 and 16 if stem 9 is eliminated. 9

Ex. E, June 1, 2011 Response to Office Action at 10. Plaintiff also admits that the shape of the "C-shaped member" was dictated by the need to match the shape of Plaintiff's previous sign frames so that the shape of the frame stayed constant.[4] Thus, both the '166 and '189 contain *functional* claim limitations that require a frame with thick cylindrical sides.

---

[4] Ex. F, 10-4-13 Deposition of Benjamin Garfinkle, 185:15-186:11.

It is also worthy of note that the parties to this lawsuit are not the only ones who have been selling a sign holder with thick cylindrical sides.[5]  Since at least 2007, FFR-DSI, Inc. has sold a sign holder with the same thick cylindrical sides Plaintiff now claims as its trade dress:[6]

 

Ex. B, Wang Decl. ¶ 7.  *See also* Ex. G, 10-8-13 Deposition of Benjamin Garfinkle, 11:22-12:15; Ex. H, 10-4-13 Deposition of Benjamin Garfinkle at 164:11-167:22 (describing the FFR product as a *knockoff* of Plaintiff's product *with a frame having the same appearance as Plaintiff's frame*).  Nevertheless, Plaintiff has not taken any action to prevent FFR from selling these sign holders.  Ex. G, 10-8-13 Deposition of Benjamin Garfinkle, 11:22-12:15.

Rather than taking such steps against FFR or, for that matter, SMMS, since 2008, Plaintiff has filed patent applications aimed at capturing similar shaped sign frames made by other companies.  *See* Ex. I, U.S. Patent Application No. 12/057,127.  In that application, Plaintiff discloses an "adaptor [that] can be used with frames, stems and bases made by others who may not produce frames with gaps but which could benefit from the signage concept proposed herein." *Id*. at pg. 5.  In other words, Plaintiff has attempted to patent devices that capture similarly shaped frames, with the only difference in shape being a lack of gap between the frame halves.  But the thick cylindrical sides would be the same as Plaintiff's sign frame.

---

[5]  Additionally, in other similar markets other sign holders have similar shapes.  *See, e.g.*, the products featured at: http://www.seton.com/plastic-pedestal-sign-95089.html.

[6]  *See* http://www.ffr-dsi.com/product/productinfo/plastic-sign-frame-system/247?cid=14 (last visited October 2, 2013)

It follows that the "thick cylindrical sides," about which Plaintiff now complains, have been generic attributes of sign holders sold by at least these three competitors since 2008.  In addition to the reality that SMMS is the smallest of these competitors, the sale of these sign holders by these three competitors certainly does not create confusion as to source, sponsorship or affiliation between Plaintiff and the other two competitors.  And Plaintiff has no basis for alleging irreparable harm exists on these facts.

## ARGUMENT

*I.*    A Temporary Restraining Order and Preliminary Injunction are Extraordinary Remedies that Should Not Be Granted to a Dilatory Plaintiff.

The standards for analyzing a motion for temporary restraining order and a preliminary injunction are the same.  *Stulbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc*., 240 F.3d 832, 839 n. 7 (9th Cir. 2001).  "A plaintiff seeking preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter* 555 U.S. at 22.

Where a plaintiff inexplicably delays pursuing relief, a showing of irreparable harm cannot follow.  *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F.Supp.2d 1086, 1097 (N.D. Cal. 2012) (Application for *ex parte* TRO denied -- six month delay in requesting TRO indicated there was no threat of actual or imminent harm); *Studio Red Inc. v. Rockwell Architecture Planning and Design, P.C.*, 2007 WL 1462458 at *4 (N.D. Cal. May 18, 2007) (Motion for preliminary injunction denied -- "Although this [eight month] delay may not be enough to bar injunctive relief, it does weigh against Plaintiff's claim of hardship.").  *See also Zodiac Pool Sys. v.*

- 11 -

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

*Aquastar Pool Prods., Inc.*, 2013 WL 690616, *5 (S.D. Cal. Feb. 22, 2013) ("A long delay before seeking injunctive relief implies a lack of urgency and irreparable harm.") (citing *Miller v. California Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir.1993)).

## II.    Defendants Are Not Subject to Personal Jurisdiction in this District.

As discussed with this Court during its October 8, 2013 hearing, Defendants are not subject to personal jurisdiction in this district.  Defendants reserve their rights to dispute personal jurisdiction and will be filing a Motion to Dismiss for Lack of Personal Jurisdiction shortly after this present opposition.  Plaintiff's request for a temporary restraining order and preliminary injunction should be denied for this reason alone.  *Walker v. Varela*, 2013 WL 816177 * 2 (C.D. Cal. Mar. 1, 2013) *citing Zepeda v. U.S. Immigration and Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1985) ("A federal court may issue an injunction if it has personal jurisdiction over the parties . . . it may not attempt to determine the rights of persons not before the court").

More particularly, there is no specific jurisdiction because neither Defendant has sold the accused sign holder in the State of California or in this judicial district.[7]  Ex. B, Wang Decl. at ¶ 15.  There is no general jurisdiction because Plaintiff will never meet the high standard required to find general jurisdiction over Defendants.  SMMS does not maintain an office in California, has only paid nominal sales taxes in California, has never had employees located in California and has had inconsequential general sales in California.  *Id*. at  ¶ 18.  Defendant Knasel has

---

[7] SMMS sold an earlier generation of its sign product to Plaintiff's counsel, who is located in California.  This is insufficient to establish personal jurisdiction, as "[a] plaintiff cannot manufacture personal jurisdiction in a trademark case by purchasing the accused product in the forum state." *Adobe Systems, Inc. v. Trinity Software Distribution, Inc.*, 2012 WL 3763643, *6 (N.D. Cal. 2012) (citations omitted).  *See also id*. at *8 (". . . Perhaps most critically, plaintiff has not established that any sales of the allegedly infringing product were made to California other than its own purchase of the product.  As set forth above, this is insufficient.  The Court therefore finds that it lacks personal jurisdiction over the [] defendants.").

| Case No.<br>cv-3:13-cv-04515 | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER** |

conducted no business in California apart from any business that might be inferred to him through his duties at SMMS.

The case law squarely rejects any finding of general jurisdiction on these facts. *See Focht v. Sol Melia S.A.*, 2012 WL 162564 (N.D. Cal. Jan. 19, 2012) (finding no general jurisdiction despite defendant's alleged annual revenue of $11 million from sales to 50,000 California residents, defendant's operation of an interactive website viewed in California, defendant's operation of a customer loyalty program and travel agent loyalty program used by California residents, defendant's maintenance of a consumer database which includes thousands of California residents, and defendant's advertising contract with a California-based corporation); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 411 (1984) (finding no general jurisdiction despite the fact that [Helicol] purchased helicopters (approximately 80% of its fleet), spare parts, and accessories for more than $4 million from Bell Helicopter Company in [the forum state] . . . sent prospective pilots to [forum state] for training and to ferry the aircraft to South America . . . [and] sent management and maintenance personnel to visit Bell Helicopter in [the forum state]" for training); *Lumascape USA, Inc. v. Vertex Lighting, Inc.*, 2006 WL 825411 at *4 (N.D. Cal. March 29, 2006) (finding that "on the present record, it seems tenuous to conclude that personal jurisdiction has been established" despite the fact that defendant had $1.5 million in sales to twenty California customers); *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1074-76 (9th Cir. 2011) (finding no general jurisdiction despite the fact that defendant misappropriated a California company's copyrighted materials, marketed its services to California students and educational institutions, had three hundred registered users and two paid subscribers in California, and maintained an interactive website accessible by users in California.); *NationalEFT, Inc. v. Checkgateway, L.L.C.*, 2013 WL 593759, *5 (S.D. Cal. Feb. 15, 2013) (finding no general jurisdiction despite defendant contracting with approximately 1,000

- 13 -

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

California merchants to provide services, having contracts with four California-based ISO's, attending four traveling trade shows in California and allegedly being "woven into the fabric of California's economy and reap[ing] millions if not billions of dollars of profit from the State's merchants and consumers on an annual basis."); *Eliminator Custom Boats v. American Marine Holdings, LLC*, 2006 WL 4941830 (C.D. Cal. Aug. 31, 2006) (finding no general jurisdiction over defendant despite having $2.6 million in boat sales to California dealers, having independent dealer contracts with two California boat dealers, having a website accessible in California, having national magazine advertisements that were circulated in California, and attending boat shows a couple times a year in California); *Shorter v. Peaches Uniforms, Inc*., 2010 WL 5135366 (E.D. Cal. Dec. 8, 2010) (finding no general jurisdiction despite defendant selling $1.5 million in goods in California, selling goods wholesale to retail stores in California, advertising on billboards and automobiles in California, and having employees living in California).

Here, where there are no sales of the accused product in this forum and where general contacts have been inconsequential much less the millions in sales that were found insufficient in the above case law, there is simply no personal jurisdiction over either Defendant.  This motion must be denied and this lawsuit must be dismissed.

## III.    Plaintiff's Application Should Be Denied As Plaintiff Is Unlikely to Prevail on the Merits of its Trade Dress Claim.

Notably absent from Plaintiff's Application is mention of the patents it owns which disclose and claim the "thick cylindrical sides" design Plaintiff now claims as its trade dress. This omission is not surprising, as these patents are fatal to Plaintiff's assertions of non-functionality.  Plaintiff's evidence and arguments regarding secondary meaning and likelihood of confusion suffer similar flaws.

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A
TEMPORARY RESTRAINING ORDER**

A.     Plaintiff's Claimed "Thick Cylindrical Sides" Trade Dress Is Functional.

The threshold inquiry for trade dress protection is whether the asserted product design is useful or provides an advantage (*i.e.* whether it is "functional.").  *Secalt S.A. v. Wuxi Shenxi Constr. Machinery Co., Ltd*., 668 F.3d 677, 683 (9th Cir. 2012).  "Were a product's functional features protected [by trademark law], then a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever." *Id* (citations omitted).  *See also* USPTO's Trademark Manual of Examining Procedures § 1202.02(a)(ii) ("the functionality doctrine ensures that protection for utilitarian product features be properly sought through a limited-duration utility patent, and not through the potentially unlimited protection of a trademark registration").  As a result, "[t]he Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *TrafFix Devices, Inc. v. Marketing Displays, Inc*., 532 U.S. 23, 34, (2001).

Plaintiff accurately identifies the four factors to be considered in determining whether a design or feature is functional.  What plaintiff fails to mention, however, is the "vital significance" given to the existence of utility patents per the Supreme Court's decision in *TrafFix*:

> [a] utility patent is strong evidence that the features therein claimed are functional. If a trade dress protection is [later] sought for those features **the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional** until proved otherwise by the party seeking trade dress protection.

532 U.S. at 29-30 (emphasis added).  The presence of a utility patent thus places a "heavy burden" on the party claiming trade dress rights to show "the feature is not functional." *Zodiac Pool Sys*., 2013 WL 690616 at *5.  In fact, the Trademark Trial and Appeal Board has found that an "applicant's expired utility patent . . . is a sufficient basis in itself for finding that the configuration is functional, given the strong weight to be accorded such patent evidence under *TrafFix*." *In re Howard Light Indus., LLC*, 80 U.S.P.Q.2d 1507, 1515 (T.T.A.B. 2006).

- 15 -

1.  **Plaintiff, among others, owns several patents that both
    disclose and claim this product feature.**

As discussed above, Plaintiff owns several patents, including the '166 and '189 patents,
that disclose the "plastic sign holder including a frame with thick, cylindrical sides" that Plaintiff
now claims as its trade dress. *See supra* at 5-6; Dkt. 7 at 2.[8]  The existence of these patents is
strong evidence of functionality that places a heavy burden on Plaintiff to prove otherwise.
*Traffix*, 532 U.S. at 29-30.  Plaintiff has not met that burden.  At minimum, the existence of these
patents raises a substantial question of whether Plaintiff's purported trade dress is protectable, and
Plaintiff's TRO request should be denied on this basis alone.

2.  **The thick cylindrical sides also function to
    strengthen and stabilize the frame.**

Simple mechanical engineering tells us that, all other things being equal, a larger diameter
tube is stronger than a smaller diameter tube for the subject sign holders.  Ex. B, Wang Decl. ¶ 9
Thus, the thick cylindrical sides function to strengthen and stabilize the frame.  *Id*. at ¶ 10.  This
functionality provides yet another basis to deny Plaintiff's request for a TRO.  That design
alternatives may exist does not eliminate this functionality.  *Talking Rain Beverage Co. v. S.
Beach Beverage Co.*, 249 F.3d 601, 604 (9th Cir. 2003) ("[T]he mere existence of alternatives
does not render a product nonfunctional").

Plaintiff also argues that its advertising does not tout any utilitarian advantage of the sign
frame shape.  Plaintiff does not provide any evidence to support this fact and thus does not meet
its burden.  Indeed, Plaintiff's advertising material touts that its sign frame shape allows it to be
interchangeable with multiple different supporting parts and used in different orientations, which
are utilitarian functions.  Ex. I, CSP001499.  Plaintiff also argues that its manufacturing process is

---

[8] Plaintiff is not the only entity to disclose a sign holder with a thick, cylindrical frame in a patent.
*See, e.g.,* U.S. Pat. No. 5,134,794, figs. 1,2,10,12,18, (issued Aug. 4, 1992), attached as Ex. K

complicated and expensive, again without providing any support.  In fact, Plaintiff's products are made by injection molding which is a common practice in the industry and not known to be expensive or complicated.  Ex. B, Wang Decl. ¶ 11.

    B.    Plaintiff Is Unlikely to Prove Secondary Meaning or Likelihood of Confusion.

    Plaintiff's request for a TRO is also undermined by the lack of evidence of secondary meaning.  The burden is on Plaintiff to prove secondary meaning, which exists when "in the minds of the public, the primary significance of a [design] is to identify the source of the product rather than the product itself."  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000); *Art Attacks Ink, LLC v. MGA Ent. Inc*, 581 F.3d 1138, 1145 (9th Cir. 2009).  Plaintiff must demonstrate that there is "a mental recognition in buyers' minds that products connected with the mark are associated with the same source." *Fuhu, Inc. v. Toys "R" Us, Inc.*, 2012 WL 5197556 *6 (S.D. Cal. Oct. 19, 2012), *citing Art Attacks*, 581 F.3d at 1145.   If Plaintiff cannot prove secondary meaning, it cannot succeed on its claim for trade dress infringement.  *Art Attacks*, 581 F.3d at 1145.  Plaintiff also claims its "strong" trade dress warrants a finding of likelihood of confusion.  Not so.  As discussed above, Plaintiff's claim for trade dress is not strong and is unlikely to succeed.

    1.    Plaintiff's "evidence" of secondary meaning is wanting.

    Plaintiff has not been the exclusive user or seller of a sign frame with thick cylindrical sides.  To the contrary, FFR, which has a large market share of this industry, and has offered such a sign frame since at least 2007.  Ex. B Wang Decl. ¶ 7; Ex. G, 10-8-13 Deposition of Benjamin Garfinkle, 11:22-12:15.  Serious questions thus exist regarding whether Plaintiff's "thick cylindrical sides" design is deserving of trade dress protection.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Additionally, Clamp Swing's declarations do not support a finding of actual confusion between Clamp Swing's products and any product alleged to infringe in Clamp Swing's claimed trade dress.  The majority of the declarations cited by Clamp Swing do not even address SMMS's third generation product and are thus irrelevant to demonstrating actual confusion in this case.  The only declaration that does address the third generation product is the Declaration of Benjamin Garfinkle, Clamp Swing's president.  Dkt. 8.  Declarations of employees have little probative value, and testimony from witnesses who had personal relationships with the plaintiff company's president has no value.  *Art Attacks*, 581 F.3d at 1147.  It follows that the testimony of a company's president has even less probative value.  Therefore, Clamp Swing has not presented any relevant, timely evidence of actual confusion in its declarations.

Clamp Swing also contends its advertising, use and sale of its products support a finding of secondary meaning.  Dkt. 7 at 19.  For advertisements, "the true test . . . is the effectiveness of this effort to create" secondary meaning.  *Int'l Jensen, Inc. v. Metrosound USA, Inc.*, 4 F.3d 819, 824 (9th Cir. 1993).  Clamp Swing has not presented sufficient evidence that it made any effort to create a link between the thick, cylindrical sides of its sign holders to the source of the product.  Although Clamp Swing's advertisements may have included photographs of the frames, the fact that images of a product were "widely available to consumers . . . provide[s] no evidence that these efforts were effective."  *Art Attacks*, 581 F.3d at 1146.  *See also, Aurora World, Inc. v. Ty Inc.*, 719 F.Supp.2d 1115, 1154-55 (C.D. Cal. 2009) (finding plaintiff did not establish secondary meaning sufficient to grant a preliminary injunction when plaintiff did not submit evidence of the effectiveness of the advertising linking the features of a product claiming trade dress protection with the source of a product).

2.      Buyers in this market are highly sophisticated.

- 18 -

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

Plaintiff argues, without any evidentiary support, that buyers in this market must be unsophisticated because the products at issue "cost only a few dollars." Dkt. 7 at 23. While such an argument may be apt where the target audience is an individual consumer making an impulse purchase in the check-out lane, customers for the products at issue here are sophisticated buyers for grocery stores and other large chains. Ex. B, Wang Decl. ¶ 12. Indeed, Plaintiff submitted the Garfinkle Declaration attesting that Plaintiff has "over 325 unique customers" with a "sales amount over $15 million in total revenue." Garfinkle Dec. at ¶ 29. This is an average of $46,154 per customer -- hardly the low price impulse shopper that Plaintiff describes for the Court. *Id.* These are not individuals or entities that are easily confused. Ex. B, Wang Decl. ¶ 12. In fact, SMMS's customers reach out directly to sales representatives for SMMS to make purchases for these sign holders. Ex. B, Wang Decl. ¶ 13. Sophisticated purchasers calling upon sales representatives directly are not going to be confused as to the source of the product they are purchasing.

>   3.   Plaintiff's proffered evidence of confusion is unconvincing.

The only purported evidence of confusion pointed to by Clamp-Swing is either speculative or irrelevant as pertaining to a non-accused product: (1) "In fact, many buyers and resellers of sign holders in the supermarket and food retailer industry have testified that *had they seen SMM's sign holder with a frame with thick cylindrical sides in a catalog or website*, they would have assumed it was a Clamp-Swing product"; and (2) "Here, a reseller of sign holder has stated in her declaration that she believed sign holders with a frame with thick, cylindrical sides that she saw in SMM's catalog were a Clamp-Swing product *when in fact they were SMM's First Generation Products*." Dkt. 7 at 22 (emphasis added). Such evidence is hardly sufficient to justify the extraordinary relief sought by Plaintiff here.

>   4.   Defendant SMMS did not copy Plaintiff's product.

- 19 -

1      Rather than trying to copy Plaintiff's product, SMMS has spent the last 18 months

2  actively trying to distinguish its product from that of Plaintiff.  Ex. B, Wang Decl. ¶¶ 5-6.

3  Plaintiff is certainly aware of this, as the parties have been in active discussions about SMMS's

4  designs for over a year.  In fact, SMMS's third generation product, the only one at issue in this

5  case, was disclosed to Plaintiff in April 2013 and Plaintiff made no claim of trade dress

6  infringement until this lawsuit was filed.  This contradicts Plaintiff's argument that

7  SMMS adopted similar trade dress and that SMMS has intended to trade on Plaintiff's alleged

8  goodwill.  It certainly did not.

9

10

11  *IV.*    **Plaintiff's Own Actions Belie Any Claim of Irreparable Harm and Tip the**
         **Balance of Hardships in SMMS's Favor.**

12

13      As Plaintiff recognizes, SMMS was selling its first generation product since at least as

14  early as 2008.  Dkt. 7 at 11.  It was not until years later, May 14, 2012, that Plaintiff initiated its

15  patent infringement lawsuit—despite the fact that the '166 patent issued in 2003.  Plaintiff states

16  that until SMMS's alleged infringement began, none of the competing plastic sign holders "had

17  frames with thick, cylindrical sides, like the Clamp-Swing products.  This was true when Clamp-

18  Swing entered the plastic sign holder market in 1984, and it remained true for more than 20 years

19  until the infringement began." *Id*. at 7  While Plaintiff describes the first generation product as "a

20  knock-off of [Plaintiff's] FrameWorks 2000 sign holder" (Dkt. 7 at 11), Plaintiff has never

21  accused the first generation product of infringing Plaintiff's alleged trade dress, and did not

22  include such a claim in the 2012 lawsuit.  But rather shockingly, Plaintiff's proffered evidence of

23  actual confusion in this case is directed at ***SMMS's first generation product***.  Dkt. 7 at 22.  Thus,

24  Plaintiff must believe that SMMS has been infringing Plaintiff's claimed trade dress for five

25

26

27

28

Case No.
cv-3:13-cv-04515                   **DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A**
                                    **TEMPORARY RESTRAINING ORDER**

1    years.[9]  But Plaintiff delayed trying to enforce, or even provide notice that it was claiming trade

2    dress rights in the thick cylindrical frame design, until now.  Such a delay is fatal to Plaintiff's

3    claim that it will be irreparably harmed if SMMS is permitted to continue selling its third

4    generation sign frames.  *Zodiac Pool Sys.*, 2013 WL 690616 at *5 (stating that "[a] long delay

5    before seeking injunctive relief implies a lack of urgency and irreparable harm" and that in a

6    trademark context, a delay of "many months" indicates that the plaintiff has not been irreparably

7    harmed).

8

9        Rather than acknowledging this shortcoming, Plaintiff unsuccessfully attempts to blame

10   SMMS for Plaintiff's delay in bringing this lawsuit.  Specifically, Plaintiff states that

11   "September 19 was also the first time that SMM allowed Clamp-Swing's counsel to view and

12   take photographs of a sample of this product."  Dkt. 7 at 11.  But SMMS provided diagrams of its

13   third generation product, including its frame, to Plaintiff's counsel on April 1, 2013.  Ex. C, April

14   1, 2013 email to James Martin.  At that time, SMMS had sold no third generation products.  Ex.

15   B, Wang Decl. ¶ 14.  In fact, SMMS had not even manufactured any third generation products.

16   *Id*.  Plaintiff did not voice any concern that this design would infringe Plaintiff's now suddenly

17   vital trade dress.  This is not surprising, given the fact that SMMS had been selling sign holders

18   having a frame with cylindrical sides for years without any trade dress allegations by Plaintiff.

19   Instead, Plaintiff waited until after the mold for the third generation product had been made, after

20   SMMS had manufactured the third generation product, and after it had sold the third generation

21   product to finally object to a product it had known about the entire time.  It appears that Plaintiff

22

23

24

25

---

[9] Plaintiff readily acknowledges this fact by repeatedly alleging in its Application that "no other plastic sign holder on the market . . . had a frame with think cylindrical sides" until 2007—the same year FFR began offering its first generation product and one year before SMMS.  *See*, *e.g.*, Dkt. 7 at 18.  But Plaintiff fails to account for its failure to assert its purported trade dress for those six years when arguing it will suffer irreparable harm if SMMS is not immediately excluded from the market.

26

27

28

| Case No.<br>cv-3:13-cv-04515 | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A**<br>**TEMPORARY RESTRAINING ORDER** |
| --- | --- |

1   simply manufactured this trade dress claim to try to push SMMS out of the market because

2   Plaintiff could not use its patent rights to prevent SMMS from selling to a large customer.

3       The lack of irreparable harm is perhaps best shown by the fact that Plaintiff first knew of

4   SMMS's product in 2008, but instead of asserting its alleged patent rights or alleged trade dress

5   rights against SMMS, Plaintiff waited until 2012 to even contact SMMS.  Ex. G, 10-8-13

6   Deposition of Benjamin Garfinkle, 11:22-12:15.  If Plaintiff was truly concerned about suffering

7   irreparable harm from SMMS's presence in the market, it would not have delayed filing these

8

9   lawsuits.

10      Further evidencing the lack of irreparable harm is Plaintiff's lack of action against FFR,

11  who has been selling a sign holder with a frame having thick cylindrical sides since at least as

12  early as 2007.  *See* Ex. G, 10-8-13 Deposition of Benjamin Garfinkle, 11:22-12:15; Ex. B, Wang

13  Decl. ¶¶ 7-8.  But Plaintiff has chosen not to enforce its claimed trade dress or alleged patent

14  rights against FFR.  No allegations of trade dress infringement have been made despite the fact

15  that FFR's sign frame is identical to Plaintiff's.  *See* Ex. G, 10-8-13 Deposition of Benjamin

16  Garfinkle at 11:22-12:15; Ex. H, 10-4-13 Deposition of Benjamin Garfinkle at 164:11-167:22

17  (describing the FFR product as a knockoff of Plaintiff's product with a frame having the same

18  appearance as Plaintiff's frame). Under these circumstances, there is simply no basis to believe

19  Plaintiff is in danger of suffering any harm.  *See Miller*, 991 F.2d at 544 ("The district court may

20  legitimately think it suspicious that the party who asks to preserve the status quo through interim

21  relief has allowed the status quo to change through unexplained delay).

22      Lastly, the timing of Plaintiff's request is suspect.  Discovery in the patent

23  infringement suit, which involves only the first and second generation products, between

24  the parties closed on October 11.  But after apparently being willing to tolerate years of

25

26

27

28

- 22 -

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A
TEMPORARY RESTRAINING ORDER**

alleged trade dress infringement, Plaintiff now requests this Court to enter emergency

relief at the same time discovery is closing in the other case.

<u>CONCLUSION</u>

Plaintiff has no protectable trade dress in the functional frame shape that has been

claimed by Plaintiff in utility patents and generally used by competitors other than

Plaintiff for years.  Further, Plaintiff's long delay in notifying SMMS—or anyone else in

the market selling these types of sign frames—of its purported trade dress belies its claim

that it will suffer irreparable harm absent preliminary injunctive relief.  Defendants

respectively request the Court to deny Plaintiff's Application for a Temporary

Restraining Order.

Respectfully submitted,

October 15, 2013                          /s/ Steven A. Nielsen

Allman & Nielsen, P.C.
Steven A. Nielsen
   Steve@NielsenPatents.com
100 Larkspur Landing Circle
Suite 212
Larkspur, CA 94939-1743
(415) 461-2700
(415) 461-2726 (fax)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A
TEMPORARY RESTRAINING ORDER**