UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAMP-SWING PRICING COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>SUPER MARKET MERCHANDISING AND SUPPLY, INC., et al.,<br><br>Defendants. | Case No. 13-cv-04515-WHO<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 7 |

## INTRODUCTION

Plaintiff Clamp-Swing Pricing Company has moved for a preliminary injunction barring Super Market Merchandising and Supply, Inc. and its founder and sole-shareholder, Kevin Knasel (collectively, "SMM"), from distributing a particular sign holder that allegedly infringes on Clamp-Swing's trade dress. Dkt. No. 7. For the reasons stated below, Clamp-Swing's motion is GRANTED as to Super Market Merchandising and Supply, Inc.

## BACKGROUND

The parties are competitors in the supermarket signage and display products market: both Clamp-Swing and SMM sell a sign holder which utilizes a frame to surround and hold a sign for products and/or prices. Clamp-Swing sells its products to supermarkets, food retailers and resellers that in turn sell Clamp-Swing's products through their own catalogues and websites. SMM also sells its products to supermarkets and food retailers, as well as through its catalogues.

According to Clamp-Swing's President (and grandson of the founder), Benjamin Garfinkle, nearly all sign holders were made of metal until the 1980s, and the "process of making

1   metal frames dictated that the sides of the metal frame had to be relatively thin and flat, and the
2   edges had to have square angles." Dkt. No. 8 ("Garfinkle Decl.") ¶¶ 7-9. Mr. Garfinkle states that
3   plastic sign holders were first introduced in the 1970s and the "companies that introduced plastic
4   sign holders essentially copied the look of the metal sign holders." *Id.* ¶ 10.

5         Clamp-Swing introduced a new plastic sign holder in 1984 called the FrameWorks
6   Modular Sign System. According to Mr. Garfinkle, this new sign-holder "functioned better and
7   looked different than everything else on the market." *Id.* ¶¶ 17-18. The new sign holder had a
8   frame with "thick, cylindrical sides" which, according to Mr. Garfinkle, was chosen to distinguish
9   its sign holders from the other plastic sign holders on the market in the supermarket and food
10  retailer industry. Mr. Garfinkle asserts that there was no functional reason for the thick,
11  cylindrical sides; it was strictly an aesthetic choice.

12        Clamp-Swing introduced a new version of its FrameWorks sign holder, known as the
13  FrameWorks 2000 Modular Sign System, in approximately the year 2000. *Id.* ¶ 25. The
14  FrameWorks 2000 sign holder featured new aspects relating to the way the frame connected to the
15  stem and base, but the aesthetic features of the frame—the thick, cylindrical sides—remained the
16  same. *Id.* Clamp-Swing claims that it has sold its FrameWorks and FrameWorks 2000 sign
17  holders to 325 direct customers in the last 15 years, amounting to over $15 million in revenue. *Id.*
18  ¶ 29. It asserts that its frames with thick, cylindrical sides constitute its trade dress and have
19  achieved secondary meaning that distinguish Clamp-Swing's sign holders from others on the
20  market.

21        Clamp-Swing alleges that in 2007 SMM began developing and selling a "knock-off" of the
22  FrameWorks 2000 sign holder "at a significantly lower price to the exact same customers who had
23  been purchasing Clamp-Swing's patented product from Clamp-Swing. Dkt. No. 18 at 17[1] (citing
24  Garfinkle Decl. ¶¶ 32-33). In response, Clamp-Swing filed a patent infringement action against
25  SMM in May 2012 in this Court. *See Clamp-Swing Pricing Company v. Super Market*
26  *Merchandising and Supply, Inc.*, Case No. 12-cv-2445 WHO. That action remains pending. In
27
28  [1] Page citations to docket entries are to ECF page numbers.

2

response to the patent infringement suit, SMM stopped selling the accused sign holders, though it maintains that none of its products infringe any of Clamp-Swing's patents. Dkt. No. 29-2 ("Wang Decl.") ¶ 5. SMM then began selling a second generation product which, according to Clamp-Swing, "employed a slightly different method of connecting the components of the sign holder, but still continued to infringe Clamp-Swing's patents." Dkt. No. 7 at 18. Clamp-Swing amended its patent infringement complaint to cover SMM's second generation sign holders. SMM voluntarily stopped selling the second generation sign holder "in an effort to amicably resolve the dispute between the parties without further costly litigation." Wang Decl. ¶ 5.

Clamp-Swing alleges that it recently learned that "SMM is about to bring to market a plastic sign holder that copies Clamp-Swing's frame with thick, cylindrical sides." Dkt. No. 7 at 17. In response, Clamp-Swing filed this action for trade dress infringement.[2] Clamp-Swing asserts that SMM has already sold the third generation sign holder to at least one customer and intends to import additional units for sale to customers in the United States. Clamp-Swing has provided declarations from customers which, Clamp-Swing asserts, establish that its trade dress—the thick, cylindrical frames—has achieved secondary meaning, that SMM's third-generation sign holders create a likelihood of confusion, and that actual confusion has occurred.

Clamp-Swing argues that it is entitled to a preliminary injunction because it is likely to succeed on the merits of its trade dress claim and it will suffer irreparable harm in the absence of injunctive relief. SMM responds that it is not subject to personal jurisdiction in California and that Clamp-Swing is not likely to succeed on the merits because (i) Clamp-Swing's "thick cylindrical sides" are functional and, therefore, not eligible for trade dress protection and (ii) Clamp-Swing cannot prove secondary meaning or likelihood of confusion.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must "establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) and that an injunction is in the

---

[2] Clamp-Swing has not accused SMM's third generation sign holder of infringing its patents.

3

public interest." *Toyo Tire Holdings of Ams., Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. NRDC, Inc*., 555 U.S. 7, 20 (2008)). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## DISCUSSION

### A. Personal Jurisdiction

SMM makes a cursory jurisdictional argument in its opposition to the motion for a preliminary injunction,[3] asserting that "there is no specific jurisdiction [over it] because neither Defendant has sold the accused sign holder in the State of California or in this judicial district."[4] Dkt. No. 29 at 12. Taking Clamp-Swing's uncontroverted allegations as true, the Court finds that the corporate defendant, Super Market Merchandising, is subject to specific personal jurisdiction in California. *See Boschetto v. Hansing*, 539 F.3d 1011, 1014 (9th Cir. 2008) ("For purposes of determining whether the court has personal jurisdiction over Defendants, the court assumes Boschetto's allegations are true.").

Under *Washington Shoe Co. v. A-Z Sporting Goods Inc*., 704 F.3d 668 (9th Cir. 2012), a defendant is subject to specific personal jurisdiction in the forum state where the defendant willfully infringes upon the plaintiff's intellectual property rights and expressly aims its conduct at the forum state. In this case, Clamp-Swing alleges that Super Market Merchandising intentionally copied Clamp-Swing's trade dress. Dkt. No. 1 ¶¶ 1, 8. Given that the parties were adversaries in a patent infringement suit for over a year before the release of Super Market Merchandising's third generation product, Super Market Merchandising knew that Clamp-Swing is a California company and that any infringement of Clamp-Swing's trade dress would harm Clamp-Swing in California. Accordingly, Super Market Merchandising's conduct was expressly aimed at California and Super Market Merchandising is subject to specific jurisdiction in California. *See Washington Shoe Co.*,

---

[3] SMM has separately filed a motion to dismiss for lack of personal jurisdiction. Dkt. No. 38. That motion is not fully briefed and is scheduled to be heard on December 11, 2013. Whether the Court has specific personal jurisdiction over Super Market Merchandising's founder and sole-shareholder, Mr. Knasel, will be determined in connection with that motion.

[4] The parties agree that general jurisdiction is not asserted over SMM in this case.

4

1   704 F.3d at 678 ("Where A–Z knew or should have known that Washington Shoe is a Washington company, A–Z's intentional acts were expressly aimed at the state of Washington.").

### B. Clamp-Swing's likelihood of prevailing

"Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001) (citation and internal punctuation omitted). To prevail on its trade dress infringement claim, Clamp-Swing must prove: (1) that its claimed trade dress is nonfunctional; (2) that its claimed trade dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that SMM's product creates a likelihood of consumer confusion. *Id.*

#### 1. Clamp-Swing's asserted trade dress is not functional

Trade dress protection only extends to products' 'non-functional' features. *See Secalt S.A. v. Wuxi Shenxi Const. Mach. Co., Ltd.*, 668 F.3d 677, 683 (9th Cir. 2012). As the Ninth Circuit has explained, if trade dress protection extended to a product's functional features, "a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever." *Id.* (citation omitted).

SMM argues that Clamp-Swing's asserted trade dress is functional, and thus not eligible for protection, because Clamp-Swing has received patents on the product features at issue and because "all other things being equal, a larger diameter tube is stronger than a smaller diameter tube" and therefore the product's thick, cylindrical sides "function to strengthen and stabilize the frame." Dkt. No. 29 at 16. The Court does not agree.

*First,* a mere drawing in Clamp-Swing's patent of a sign-holder with thick, cylindrical sides—the claimed trade dress—does not mean that the thick, cylindrical sides are *claimed* in the patent, as opposed to merely illustrating an embodiment of the patented invention. *See, e.g., Global Mfr. Group, LLC v. Gadget Universe.com*, 417 F. Supp. 2d 1161, 1169-70 (S.D. Cal. 2006) (description of alleged trade dress in utility patent did not render trade dress functional). SMM asserts that the "'C-shaped member' that frictionally captures the cylindrical frame is specifically claimed" in Clamp-Swing's inventions. Dkt. No. 29 at 9. But SMM does not connect

5

1  the "C-shaped member" to the alleged trade dress. As Clamp-Swing's patents do not appear to
2  claim the alleged trade dress, Clamp-Swing's patents do not support a presumption that the
3  claimed trade dress is functional.

4  *Second*, the Court disagrees with SMM's argument that the thick cylindrical sides are
5  functional because a larger tube is stronger. Under SMM's argument, any "larger" tube,
6  regardless of size or shape, would be functional because the larger the tube, the stronger the frame.
7  That is not the law. A feature is functional within trade dress law if its *particular* shape serves a
8  function. *Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1008 (9th Cir. 1998) ("The
9  issue is not whether a product is functional, but whether *this particular* shape and form of product
10 which is claimed as trade dress is functional.") (citing J.T. McCarthy, *McCarthy on Trademarks*
11 *and Unfair Competition* § 7:70 at 7–14 (4th ed.1998)). As SMM has not established that the
12 *particular* shape and form of the alleged trade dress is functional, this argument fails.

13     **2.  Clamp-Swing is likely to prove secondary meaning and likelihood of confusion**
14     "The trade dress of a product or service attains secondary meaning when the purchasing
15 public associates the dress with a particular source." *Clicks Billiards*, 251 F.3d at 1262. Clamp-
16 Swing submitted the declarations of six supermarket buyers and resellers, each of whom has many
17 years of experience in the industry, in support of its argument that Clamp-Swing's trade dress has
18 achieved secondary meaning in the supermarket sign holder market. Each declarant states that
19 Clamp-Swing's plastic sign holders with frames with thick, cylindrical sides are different from
20 other plastic sign holders and, by the 2000s, each of the declarants "associated plastic sign holders
21 that had frames with thick, cylindrical sides with Clamp-Swing and Clamp-Swing only."
22 Anderson Decl. (Dkt. No. 14) ¶¶ 5-8; Belli Decl. (Dkt. No. 18) ¶¶ 4-5; Buttes Decl. (Dkt. No. 17)
23 ¶¶ 5-6; Gettys Decl. (Dkt. No. 16) ¶¶ 6-7; Glunt Decl. (Dkt. No. 15) ¶¶ 5-6; Thornton Decl. (Dkt.
24 No. 19) ¶¶ 5-6. The Court finds that the declarations proffered by Clamp-Swing establish a
25 likelihood that Clamp-Swing's sign holders have achieved secondary meaning.

26     The declarants also state that if they had seen one of SMM's earlier generation products in
27 a catalog or on a website, they would have assumed that the product was a Clamp-Swing product.
28 SMM responds that the declarations do not establish likelihood of confusion because the

declarants do not address SMM's current product, but instead address SMM's earlier generation product, which SMM voluntarily discontinued after Clamp-Swing filed its patent suit. The Court does not agree that this distinction precludes a finding of confusion. The claimed trade dress—frames with thick, cylindrical sides—was apparently present on SMM's earlier generation products as well. As SMM recognizes, in light of the declarations, Clamp-Swing "must believe that SMM[] has been infringing Plaintiff's claimed trade dress for five years." Dkt. No. 29 at 21. SMM's current generation products have the same allegedly infringing trade dress as the earlier generation products referenced in the declarations, and equally create a likelihood of confusion.

The Court finds that Clamp-Swing has shown a likelihood of proving a likelihood of confusion under the *Sleekcraft* factors identified by the Ninth Circuit for analyzing likelihood of confusion. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) *abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003). In particular, the following demonstrates a likelihood of confusion: the shape and form of the two products is markedly similar; Clamp-Swing's trade dress is strong, as shown in the declarations proffered by Clamp-Swing; there is evidence of actual confusion (Anderson Decl. ¶ 7); the products compete directly with each other; the products are marketed in the same channels; and SMM's sign holders are not marked to identity them as SMM products (or distinguish them from Clamp-Swing's products).

### C. Clamp-Swing has demonstrated irreparable harm

Inferior quality of an infringing product can constitute irreparable harm. 5 McCarthy on Trademarks § 30:47 (4th ed. 2010) (citing *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) ("if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market"). Clamp-Swing argues that there are five "significant problems with the quality and functionality" of SMM's sign holder: (1) the frame halves do no stay firmly together and will separate easily when exposed to the rigors of daily use; (2) the connections between the frame, stem, and base are weak, which makes them vulnerable to coming apart; (3) the gap for the sign card is not sufficiently wide, rendering it difficult to insert the sign; (4) the outer stem halves

start to separate and may break apart when the unit is twisted; and (5) the adjustable height mechanism for the stem is so weak that by applying minimal of force to the top of the unit, the stem partially collapses instead of staying at the desired height. Dkt. No. 31 at 14.

Clamp-Swing submitted customer testimony and video and photo evidence credibly showing that the Clamp-Swing sign holder is superior in the five areas it identified. Three industry managers or executives who are familiar with Clamp-Swing's sign holder detailed the ways in which SMM's third-generation sign holders are inferior and stated that if they purchased SMM sign holders thinking they were Clamp-Swing sign holders, they would find a new supplier or not buy the product again. Goddard Decl. (Dkt. No. 44) ¶¶ 1-8; Chapman Decl. (Dkt. No. 43) ¶¶ 1-8; Cambra Decl. (Dkt. No. 42) ¶¶ 1-8. The Court also finds the video and photo evidence submitted by Clamp-Swing compelling. In particular, Video No. 3 shows that Clamp-Swing's sign holder withstood a drop test—each sign holder was dropped from a desk height of 29 inches onto a concrete floor—much better than the SMM sign holder. On each drop, the SMM sign holder's stem completely separated from the base and/or the frame completely separated from the stem. In contrast, the components of the Clamp-Swing sign holder never completely separated.

In response, SMM asserts that it subjected its sign holders to various "objective measurements and tests" which refute the alleged shortcomings. Dkt. No. 39 at 2. The tests employed by SMM have two fatal flaws: it is not evident to the Court that the tests simulate the 'real-world' conditions to which the sign holders will be exposed; and, the tests do not compare SMM's sign holder to Clamp-Swing's sign holder. SMM's tests do not refute Clamp-Swing's evidence that its sign holder is superior, at least with respect to the five shortcomings Clamp-Swing identified.

The Court also rejects SMM's argument that Clamp-Swing's delay in enforcing its intellectual property rights demonstrates the lack of irreparable harm. Clamp-Swing did indeed delay—SMM began selling its allegedly infringing first-generation product in 2008, but Clamp-Swing did not file its patent suit against SMM until 2012. But delay is merely one factor to consider when evaluating irreparable harm. *See, e.g. Apple, Inc. v. Samsung Electronics Co., Ltd.*, 877 F. Supp. 2d 838, 914 (N.D. Cal. 2012) ("a showing of delay does not preclude a finding of

8

irreparable harm as a matter of law") *rev'd on other grounds*, 695 F.3d 1370 (Fed. Cir. 2012). Given the likelihood of confusion and Clamp-Swing's sufficient demonstration of the relatively poorer quality of SMM's sign holders, Clamp-Swing has shown that it is likely to suffer irreparable harm to its reputation if an injunction does not issue.

### D. The balance of equities and the public interest weigh in favor of granting in injunction

SMM does not directly respond to Clamp-Swing's argument that the balance of equities and the public interest favor granting a preliminary injunction. The Court finds that the balance of equities tips in favor of granting the preliminary injunction. For the reasons stated above, Clamp-Swing will likely suffer irreparable harm to its reputation, and hence lose customers, if an injunction does not issue. In contrast, the hardship to SMM is minimal as it has apparently only sold its third-generation product to one customer. An injunction also favors the public interest as the public interest is served where an injunction prevents customer confusion. *See, e.g., Internet Specialties West, Inc. v. Milon-Digiorgio Enters*, 559 F.3d 985, 993 (9th Cir. 2009) (noting "the usual public interest concern in trademark cases: avoiding confusion to consumers").

### E. Bond

As a condition of the preliminary injunction and pursuant to Federal Rule of Civil Procedure 65(c), the Court will require Clamp-Swing to post security in an amount sufficient to secure payment of any damages sustained by SMM if SMM is later found to have been wrongfully enjoined. SMM shall submit evidence concerning the proper amount of bond by Tuesday, November 26, 2013. Clamp-Swing shall submit a response by Tuesday, December 3, 2013. Neither party's submission shall exceed five pages in length.

## CONCLUSION

Clamp-Swing's motion for a preliminary injunction is GRANTED. Super Market Merchandising and Supply, Inc., and its officers, agents, employees, and those acting in concert with any of them,

**ARE HEREBY RESTRAINED AND ENJOINED FROM**:

a. manufacturing, selling, offering for sale, marketing, promoting, or distributing the product

1 that has been identified as the SMM "Third-Generation Product" in Clamp-Swing's

2 Complaint and moving papers filed in this action; and/or

3   b. engaging in any other act or conduct that is likely to cause confusion, or to cause mistake,

4 or to deceive as to the affiliation, connection, or association of SMM with Clamp-Swing,

5 or as to the origin, sponsorship, or approval of SMM's goods, services, or commercial

6 activities by Clamp-Swing.

**IT IS FURTHER ORDERED THAT**

SMM shall submit evidence concerning the proper amount of bond by Tuesday, November 26, 2013. Clamp-Swing shall submit a response by Tuesday, December 3, 2013. Neither party's submission shall exceed five pages in length.

**IT IS SO ORDERED**.

Dated: November 21, 2013



WILLIAM H. ORRICK
United States District Judge